IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| **CHRIS WILLIAMS,**<br><br>          Plaintiff,<br><br>vs.<br><br>**TIM DAHLE IMPORTS, INC., a Utah corporation et al.,**<br><br>          Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No.  2:03CV46 DAK |

      This matter is before the court on a Motion for Summary Judgment filed by Defendant Tim Dahle Imports, Inc. dba Tim Dahle Nissan ("TDN" or "Defendant").  A hearing on the motion was held on March 23, 2006.  At the hearing, Defendant was represented by Nan T. Bassett.  Plaintiff Chris Williams ("Ms. Williams" or "Plaintiff") was represented by Kara L. Barton.  Before the hearing, the court considered carefully the memoranda and other materials submitted by the parties.  Since taking the motion under advisement, the court has further considered the law and facts relating to this motion.  Now being fully advised, the court renders the following Memorandum Decision and Order.

**I.  BACKGROUND**

      This action arises out of Ms. Williams' employment at TDN.  She has brought claims under the Equal Pay Act (the "EPA") and Title VII.  She essentially argues that, when she was promoted to General Sales Manager ("GSM") at TDN, she was not paid as much as the previous

GSM. who was a male.  She also claims that she was later discriminated against based on her gender because a male, who was allegedly less qualified and who was her subordinate, was promoted to the General Manager position over Plaintiff, and she was terminated.   Plaintiff also appears to claim that TDN is liable under the EPA and Title VII for compensating Plaintiff less than other similarly situated coworkers.

Defendant, on the other hand, disputes that it has discriminated against Plaintiff under either the EPA or Title VII and contends that Plaintiff cannot meet her burden under either of the statutes.  Thus, Defendant argues, the case must be dismissed.

## II.  FACTS

Plaintiff worked in the auto sales industry for approximately nine years prior to being hired by TDN.   She acknowledges that the industry is very volatile and that compensation packages–or pay plans–can change.   Indeed, she testified that she left another auto sales job at D. Dahle Mazda in part because her pay plan changed.  A change in pay plans also influenced her decision to leave Utah Auto Collection ("UAC").   She testified that, while working at UAC, her paycheck was "cut in half, and that pay plan was not going to work for me."   Even after leaving TDN, Plaintiff was offered the General Manager position at the Super Ford Store, but turned it down because the "pay plan did not work for [her]."

Tim Dahle ("Mr. Dahle") is the owner and General Manager of TDN.  It is undisputed that Mr. Dahle's custom is to adjust pay plans consistent with the auto sales industry.   The New and Used Car Managers, GSMs, and General Managers ("GM") of Mr. Dahle's dealerships are all on varying Pay Plans.

Plaintiff began to work for TDN in February 1999 as a Used Car Manager.  Rychardz

Benns was the GSM at the time Plaintiff was hired as the New Car Manager. Mr. Benns was paid a $7,000 monthly salary plus 8% commission of gross profit, less variable expenses. Also, Mr. Benns could earn an additional 10%, but had to purchase that additional amount 5% at a time for the cost of $178,155 per 5%. Mr. Benns' pay plan resulted in a yearly income of $168,283.23 for 1999 and $311,918.04 for 2000. It is undisputed that Mr. Benns was terminated in part because Mr. Dahle felt that Mr. Benns was making too much money.

In December of 2000, after Mr. Benns was terminated, Plaintiff was promoted to the position of GSM. Mr. Dahle presented her with a detailed Pay Plan, which she reviewed and signed. Plaintiff knew the percentage she accepted was less than the percentage Mr. Benns had been paid, and she accepted the pay plan with that knowledge. Plaintiff's income when she was the GSM was $153,322.74 for 2001 and $112,472.73 for the six months she worked at TDN in 2002. It is undisputed that for every year Plaintiff worked at TDN, without exception and without regard to their levels of management, Plaintiff made more money than every male manager for both locations–with the exception of Mr. Benns.

Plaintiff argues, however, that at the time she was promoted to GSM in January 2001, she was performing the jobs of Used Car Buyer, GSM, New Car Manager and Used Car Manager. She contends that, despite performing the job of three–and sometimes four–people, her commissions were less than those paid for management at the Sandy store. Plaintiff claims that she received only 7.5% of gross profit, less variable expenses. In contrast, she claims, the Sandy store General Manager, Matt Bassett, was receiving a guaranteed $9,000 monthly salary plus a bonus. Mr. Bassett's Used and New Car Sales Mangers were each receiving five and six percent of the gross profit minus variable expenses. Thus, Plaintiff maintains, despite the fact that she

3

was performing the jobs of four people, her commissions were significantly less than those paid for management of Tim Dahle's Sandy store. She also complains that she was the only manager who was refused a bonus plan and who was never given an incentive bonus.

In March of 2002, Plaintiff's "life partner," Johnna Abrams, incorporated a business called Salt Lake Imports ("SL Imports"). On June 17, 2002, SL Imports applied for a business license with the City of North Salt Lake, with Plaintiff and Ms. Abrams listed as the owners. SL Imports was organized to buy and sell used cars for profit. TDN is also in the business of selling used cars for profit, as it sells used cars at all of its dealerships. Plaintiff helped to fund the opening of SL Imports, cashing in stocks she owned with Ms. Abrams and getting a second mortgage on the home they owned together.

On June 21, 2002, while Plaintiff was the GSM for TDN, she attended an auto auction in Nevada as the representative of TDN. TDN has produced evidence that, at that auction, Plaintiff was also the representative of her competing business, SL Imports, and that she bid on and purchased cars for both SL Imports and TDN. Plaintiff disputes that she attended the auction as a representative for SL Imports. Plaintiff also disputes that she bid on any cars for SI Imports; rather, she claims that her brother bought the cars, using Plaintiff's credit card because of his previous financial problems.

While Plaintiff was the GSM, Mr. Dahle learned of her involvement in the competing dealership. Indeed, Plaintiff admits that she told him about SL Imports, seeking his approval and assuring him that she had merely provided financial backing to her partner and that she was not

competing with him.[1]   Mr. Dahle did not express any concern to Plaintiff at that time.

Plaintiff's employment was terminated on July 1, 2002.  TDN claims that Plaintiff was terminated in large part because of her competing car dealership.  After Plaintiff was terminated, Mr. Ronnie Eames became GM of TDN.  According to Plaintiff's termination notice, the reason for the termination was "Change of GM, Ronnie Eames."  Plaintiff asserts that she was told that Mr. Dahle had decided to retire and to hire a new GM–Mr. Eames.  Mr. Dahle testified that he did not tell Plaintiff the true reason for her termination because he did not want to get into the conflict-of-interest issue with Plaintiff.  Thus, TDN does not dispute that Mr. Dahle did not tell her the true reasons for his decision to terminate her.

Plaintiff disputes that she was terminated for the reason of her allegedly competing business, arguing that this reasons is merely pretextual.  She claims instead that her termination was because of her gender.   In support of her argument that the "competing business" reason is pretextual, she offers evidence that, in late March or early April 2002, Mr. Eames told another employee at TDN that Plaintiff would soon be fired and that Eames would become the GM.  Plaintiff claims, however, that Mr. Dahle did not know of SL Imports at that time and thus could not have sought to terminate her for her competing business.   But Plaintiff herself testified in her deposition that she told Mr. Dahle about SL Imports in late March or early April 2002 about her business, thus comporting with the time frame in which Mr. Eames allegedly told another employee that Plaintiff would soon be fired.

---

[1] TDN has produced evidence that SL Imports was indeed a competitor because a type of car that is sold by TDN was purchased at an auction by SL Imports.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56c;  *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In reviewing the factual record, the court construes all facts and make reasonable inferences in the light most favorable to the non-moving party.  *See Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir.1998).

Where the moving party bears the burden of proof on an issue, that party cannot prevail on summary judgment "unless the evidence that he provides on that issue is conclusive." *Torres Vargas v. Santiago Cummings*, 149 F.3d 29, 35 (1st Cir. 1998).  *See also Equal Employment Opportunity Comm'n v. Union Independiente De La Autoridad De Acueductor Y Alcantarillados De Puerto Rico*, 279 F.3d 49, 55 (1st Cir. 2002) (same); *Calderone v. United States*, 799 F.2d 254, 258 (6th Cir. 1986) (explaining that if a summary judgment movant has the burden of proof, "his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.") (citation and emphasis omitted); *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) ("[I]f the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor.").

## IV.  DISCUSSION

**A.  EQUAL PAY ACT**

To establish a prima facie case under the Equal Pay Act, Plaintiff must show (1) that she was performing work that was "substantially equal" to that of male coworkers, with "equality" being measured on the basis of the skills, duties, supervision, effort, and responsibilities of the jobs; (2) the conditions where work was performed were basically the same; and (3) male employees were paid more.  29 U.S.C. § 206(d)(1); *Sandoval v. City of Boulder*, 388 F.3d 1312 (10th Cir. 2004).   Exceptions to equal pay are made when payment is made pursuant to (I) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.  29 U.S.C. § 206(d)(1).

The Tenth Circuit does "not construe the 'equal work' requirement of the EPA broadly," and it has stated that "failure to furnish equal pay for 'comparable work' or 'like jobs' is not actionable.  *Id.* at 1327 (quoting *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1364 (10th Cir. 1997)).  Rather, "the jobs must be substantially equal in terms of skill, effort, responsibility, and working conditions." *Id.* at 1327-28.  Once a plaintiff has established that an employer paid unequal wages for jobs performed under similar working conditions that required essentially equal skills, effort, and responsibility, the burden of persuasion then shifts to the defendant, requiring that the employer prove that one of the four specific exceptions justifies the wage disparity.  *See Tidwell v. Fort Howard Corp.*, 989 F.2d 406, 409 (10th Cir. 1993); *Sinclair v. Automobile Club of Okla., Inc.*, 733 F.2d 726, 728 (10th Cir. 1984).

In this case, Plaintiff contends that she was not paid as much as her predecessor, Mr.

Benns. The court finds, however, that Plaintiff has not established a prima facie case under the EPA regarding the pay differential between Mr. Benns and Plaintiff. Plaintiff has not offered any evidence to demonstrate that she and Mr. Benns worked under similar working conditions or that the same effort was required. Plaintiff herself testified that pay plans change constantly in the car sales industry to adjust to market conditions and that she has left other car sales positions because of changing pay plans. Here, there is no evidence that market conditions were the same at the time that she was promoted to the position that Mr. Benns had previously filled. Similarly, she has not produced any evidence regarding the level of effort required to make a sale at the time that she filled the GSM position compared to when Mr. Benns filled that position.

Moreover, even if Plaintiff had established a prima facie case of unequal pay, her claim would still fail. Defendant has demonstrated that the difference in pay was based on a factor other than gender, and no reasonable jury could find otherwise. Defendant has produced undisputed evidence that Mr. Benns' employment was terminated in part because his pay plan was too lucrative. The EPA does not require Defendant to forever maintain the same pay plan. Thus, Plaintiff's claim under the EPA regarding the differential in compensation between Mr. Benns' and Plaintiff's compensation fails and must be dismissed.

To the extent that Plaintiff has asserted an EPA claim based on a compensation differential between herself and other managers, the court finds that this issue has not been adequately briefed. Plaintiff does not appear to have asserted such an EPA claim in her Amended Complaint. In Defendant's Motion for Summary Judgment, however, Defendant asserts that Plaintiff made more than every male manager in any management position at either of two Nissan locations, with the exception of Mr. Benns. It is unclear to the court whether

Defendant, by making this assertion, is seeking summary judgment on a possible EPA claim based on the salaries of other managers or whether Defendant was merely pointing out that Plaintiff has made more than the other managers, with the sole exception of Mr. Benns.

Plaintiff has done little to clarify this issue. In her Memorandum in Opposition, she discusses an alleged disparity in commission rates in her "introduction" and in her statement of contested material facts, but she spends very little time arguing the issue in the context of an EPA claim–and does not mention it at all in her discussion of her Title VII claim. The extent of her EPA argument appears on page 16 of her Opposition Memorandum. Plaintiff admits that she made a good wage, and then she states:

> In contrast, Ms. Williams' counterparts in Sandy were receiving the following salaries: Matt Bassett, General Manger made a monthly salary of $9,000, in addition to a bonus agreement of five percent (5%) less management fee; use of a demo vehicle and an old age car policy (write down). Mike Fuller, a Sandy sales manager received five percent (5%) of new and used gross profits. Rob Messer received six percent (6%) of new and used gross profits in addition to a bonus agreement. At the same time, two of her male counterparts were making eleven percent (11%) of the gross profits less variables, in addition to bonuses. For the same work and same responsibilities of these two male sales managers, Mrs. Williams received seven and one-half percent.

Later, Plaintiff states that "Defendant's calculations regarding the incomes of the sales managers at various stores are misleading insofar as they do not take into account the fact that Ms. Williams' scope of responsibility exceeded those of her male counterparts and she was paid less for her efforts." Opp'n Mem. at 16-17.

Plaintiff's evidence highlights that different managers have different pay plans with different guaranteed salaries, different commission rates, and different other incentives.

9

Plaintiff, however, has failed to link this evidence to the elements of an EPA claim.[2] But rather than pointing out the insufficiencies in Plaintiff's claim, Defendant did not discuss this issue further in its Reply Memorandum.  Subsequently, Plaintiff's counsel spent significant time arguing this evidence about the disparity in commission rates, bonuses, and vacations during oral argument on the Summary Judgment Motion, although, as Defendant's counsel pointed out, many assertions were made that were not contained in Plaintiff's Opposition Memorandum and therefore are not supported by any evidence.

Because of the confusing nature of both parties' handling of this evidence concerning the alleged compensation disparity between Plaintiff and other allegedly similarly situated managers, the court declines to rule at this time on any possible claim (either under the EPA or Title VII) arising out of this evidence.

**B. TITLE VII**

To prevail on a Title VII claim, a plaintiff must prove that the adverse action was based upon intentional discrimination.  *See EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1191 (10th Cir. 2000).  In this case, the court has assumed that Plaintiff has established a *prima facie* case of discrimination based on gender.  Defendant, however, has offered a legitimate, non-discriminatory reason for its decision not to promote her and to terminate her employment.

---

[2] Plaintiff has done nothing to establish that her work was "substantially equal" to that of her male coworkers, with "equality" being measured on the basis of the skills, duties, supervision, effort, and responsibilities of the jobs.  Moreover, while Plaintiff argues that she held the equivalent of three or four positions (and appears to claim that she should have been paid the salary and commissions of three or four people), she has not claimed that these additional titles required her to work harder or to work longer hours than other managers.  She has provided the court with no basis whatsoever on which to evaluate the alleged inequity between Plaintiff's pay plan and the pay plans of similarly situated male managers.

It is undisputed that Plaintiff's partner started what could have reasonably been viewed as a competing business. It is undisputed that Plaintiff helped fund the competing business. It is undisputed that Defendant believed that Plaintiff was at an auto auction in Nevada as a representative for not only TDN, but also for SL Imports. It is undisputed that Defendant believed that Plaintiff had purchased a car at that auction for SL Imports–and indeed Plaintiff admits that her brother used Plaintiff's credit card for that purchase.

Plaintiff's attempt to challenge the merits of Defendant's beliefs is misguided. Whether or not she was actually competing with TDN or involved with SL Imports is largely irrelevant. A challenge of pretext requires the court to look at the facts as they appeared to the person making the decision to terminate plaintiff. *See Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1231 (10th Cir. 2000); *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1207 (10th Cir. 1999) (noting that it is the manager's perception of the employee's performance and not the employee's subjective evaluation of her performance, that is relevant in determining pretext). Pretext may be shown by "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Bryant v. Farmers Ins. Exchange*, 432 F.3d 1114 (10th Cir. 2005).

Plaintiff has not demonstrated that Defendant's beliefs about her involvement and/or association with SI Imports were unreasonable or otherwise unworthy of belief. While she attempts to discredit Mr. Dahle by, among other things, questioning when he discovered that she was involved in SL Imports, her attempts fail to create any disputed fact regarding pretext. For

11

example, Plaintiff offers evidence that, "in late March or early April 2002," Mr. Eames, who was eventually promoted over Plaintiff, told another employee at TDN that Plaintiff would soon be fired and that Eames would become the GM. Plaintiff argues that this demonstrates pretext because Mr. Dahle did not even know of SL Imports at that time. However, Plaintiff herself testified that she told Mr. Dahle about SL Imports in "late March or early April 2002." Thus, she has failed to create a disputed issue about whether he knew at that time about SL Imports.

In short, Plaintiff has failed to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." Thus, Plaintiff's claim for discrimination based on TDN's failure to promote Plaintiff and its termination of her employment fails.

## V.  CONCLUSION

For the foregoing reasons and good cause appearing, IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment [docket #29] is GRANTED in part and DENIED in part. Plaintiff's claim for gender discrimination under Title VII based on TDN's termination of her employment and/or TDN's failure to promote her is DISMISSED. Plaintiff's claim under the Title VII and the EPA regarding the alleged pay disparity between Plaintiff and Mr. Benns is DISMISSED.

As discussed above, to the extent Plaintiff has asserted a claim under Title VII and/or the EPA based on the alleged salary disparity between Plaintiff and other allegedly similarly situated managers, it is unclear whether Defendant has moved for summary judgment on such claims, and, in any event, the merits of such claims have not been adequately briefed by either party. To

the extent Defendant intended to seek summary judgment on such claims, Defendant's motion for summary judgment on these specific claims is DENIED without prejudice to renew prior to July 7, 2006. Should Defendant's counsel conclude that these claims–to the extent they even exist–are not appropriate for summary judgment, counsel is directed to contact the court and request that a trial date be set for those claims.

DATED this 5th day of May, 2006.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge